## IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

| | |
|---|---|
| **WEST COUNTY PROPERTY HOLDINGS, LLC,** | Case No.: 23SL-CC00917 |
| Plaintiff, | Division: 2 |
| v. | |
| **WCCC OP LLC,** | |
| Defendant. | |

### AMENDED MOTION FOR APPOINTMENT OF GENERAL RECEIVER

COMES NOW WEST COUNTY PROPERTY HOLDINGS, LLC ("**Landlord**"), by and through its undersigned counsel, and pursuant to §198.003 *et seq*. of the Revised Statutes of Missouri (the "**Omnibus Nursing Home Act**"), or in the alternative, pursuant to §515.500 *et seq*. of the Revised Statutes of Missouri (the "**Missouri Commercial Receivership Act**" or "**MCRA**") and Missouri and Supreme Court Rule 68.02, hereby moves this honorable Court for entry of an Order appointing Michael F. Flanagan as General Receiver with respect to the real and personal property further described herein and owned by Defendant WCCC OP LLC ("**Tenant**"), and in support thereof respectfully states as follows:

1. Concurrently filed herewith and in support of this Motion is the Affidavit of Amanda Colwell, who is a Vice President of Asset Management for Cascade Capital Group, the authorized agent of Landlord. Such Affidavit from Amanda Colwell verifies the facts and matters set forth herein, further authenticates each of the Exhibits identified herein, and satisfies the requirements of Section 198.099 and 198.105.

### BACKGROUND

*The Lease Transaction*

88826518.2

2. Landlord is the owner of certain real and personal property located at 312 Solley Drive, Rear, Ballwin, Missouri 63021 (collectively and all as further described in the Lease (defined below), the "**Property**"). The Property is improved with a skilled care nursing facility that currently has 52 occupants but capacity for up to 137 beds. A section of the Property is undergoing renovation and not currently available for occupancy.

3. On March 1, 2021, Landlord entered into a certain Lease Agreement (the "**Lease**") with Tenant pursuant to which Tenant agreed to rent the Property for an initial term of ten (10) years with certain extension rights further identified in the Lease. A true and correct copy of the Lease is attached to hereto and incorporated herein by reference as **Exhibit A**.

4. Under Article IV of the Lease, Tenant is to pay certain amounts on a monthly basis, which amounts are referred to collectively in the Lease as the "**Rents**." Article VII of the Lease provides that Tenant shall also make certain monthly payments into the tax and insurance reserve accounts for payments of taxes and insurance with respect to the Property. Article IX of the Lease also requires Tenant to maintain insurance at the Property, all in accordance with the terms set forth therein.

5. Article VIII of the Lease requires that during the term of the Lease, Tenant uses and operates the Property as a skilled nursing facility and not for another purpose. In addition, Tenant must maintain in good standing and full force a certificate of need and license from the Missouri Department of Health and Senior Services and any other government agencies permitting operations at the Property as a skilled nursing facility.

6. Under Article XI of the Lease, Tenant must keep and maintain the Property in good order and condition without waste and in a suitable state of repair. Tenant is to also cause the work

described in Schedule 11.2 of the Lease to be completed in good, safe and workmanlike manner within the timeframe set forth in Schedule 11.2.

7. Article XIII of the Lease provides that Tenant is to "obey, observe and promptly comply with all present and future laws, ordinances, orders, rules, regulations and requirements of any federal, state and municipal government agency or authority having jurisdiction over the [Property] and the operation thereof as a skilled nursing facility …"

8. Finally, pursuant to Section 27.3 of the Lease, Tenant must fully comply with Schedule 27.3 of the Lease, which sets forth the Tenant's covenants as required under the Tenant's applicable loan documents. Tenant failed to achieve a debt yield percentage of not less than 4.00% for the applicable test period ending June 30, 2022, and not less than 6.00% for the appliable test period ending September 30, 2022, and not less than 8.00% for the applicable test period ending December 31, 2022, pursuant to Section 4.12(a)(xii) of Schedule 27.3. Furthermore, Tenant failed to achieve the applicable minimum fixed charge coverage ratio of not less than 1.10:1.00 for the applicable test period ending September 30, 2022, and December 31, 2022, pursuant to Section 4.12(a)(xiii) of Schedule 27.3.

*Breaches Under The Lease*

9. Tenant failed to complete the required work under Article XI of the Lease. Specifically, the parking lot and elevator are both in need of repair. Tenant still does not have a current inspection and approval for safe operation of the elevator. Further, Tenant is in breach of its financial covenants to its secured lender, in breach of Section 27.3 of the Lease.

10. In addition, staring in October 2022, Tenant has not timely paid the Rents and other amounts due and owing under the Lease. While certain reserve accounts maintained by Landlord

have funds to cover the amount of the past due Rents and other amounts owed under the Lease, those reserve accounts have been depleted as of March 2023 and there will be insufficient funds held in reserve to pay any Tenant obligations going forward. Further, according to financial statements previously provided by Tenant, Tenant has been unable to timely pay its operating expenses and has been operating at a deficit for over a year. Thus, the financial statements and other information available to Landlord reflect that there will be insufficient funds available starting in April 2023 to pay the monthly obligations of the Tenant due under the Lease and to pay basic operating expenses at the Property.

11. More importantly, Tenant's financial instability has resulted in an inability of Tenant to properly maintain the Property. In January 2023, a representative of Landlord visited the Property and discussed with Tenant the need to complete certain repairs. Just over a month later, on February 27, 2023, Landlord received a notice from the City of Winchester regarding Tenant's failure to maintain a valid business license with respect to its operations. A true and correct copy of the notice received from the City of Winchester is attached hereto and incorporated herein as **Exhibit B**.

12. Later that day, Landlord was informed by telephone that Tenant has received notice from local municipal officials that they would be visiting the Property and be issuing a 30-day notice informing Tenant that it must cease operations at the Property and relocate the residents located therein.

13. The next day, Landlord received a copy of a letter (the "**West County Notice**") from the West County EMS & Fire ("**West County**") in which Tenant was informed of several violations at the Property, including, without limitation, the demolition, renovation and remodeling

of the Property without valid permits, unrepaired damage to ceilings in occupied portions of the Property, the failure to maintain adequate egress paths, and egress doors being blocked. In the letter, West County notified Tenant that its "occupancy has been revoked immediately …" and that "[a]bsolutely no new residents may be brought into the facility and all existing residents must be relocated by 11:59PM on Wednesday, March 29." A true and correct copy of the West County Notice is attached hereto and incorporated herein as **Exhibit C.**

14. On March 1, 2023, a representative of the Landlord again visited the Property to complete an inspection and address firsthand the closure notice received by Tenant. Landlord's representative observed during the visit that the condition of the Property had deteriorated significantly since Landlord's visit just a month earlier. Also during the visit, Landlord's representative was informed that the local public health department ("**Public Health**") had completed a physical inspection of the Property on February 28, 2023 that was initiated in response to the West County Notice. During that visit, Lender's representative observed a phone conference with Public Health which was finishing its February 28, 2023 inspection report remotely on March 1, 2023. During that call, Landlord's representative learned that Public Health issued four "K-tags" each of which contained multiple violations for life safety issues. Public Health also expressed similar concerns as to what had previously been addressed by West County. During the call on March 1, 2023, Public Health directed that Tenant submit a closure plan for approval and to send notification letters to the residents due to the 30 day notice to vacate in the West County Notice.

15. As a result of the foregoing, Landlord notified Tenant of its breaches under the Lease, and, that as a result of the same, Landlord intended to move for the appointment of a receiver at the Property on an emergency basis.

## MOTION FOR APPOINTMENT OF RECEIVER

16. This Court has authority to appoint a receiver on the basis of two sperate statutory schemes, the (I) Omnibus Nursing Home Act, and alternatively, the (II) the Missouri Commercial Receivership Act.

### I. Authority Under the Omnibus Nursing Home Act

17. The relevant provision of the Omnibus Nursing Home Act provides that "the owner or operator of a facility may petition for appointment of a receiver for a facility when any of the following conditions exist:

1. The operator is operating without a license;

2. The department has revoked the license of an operator or refused to grant an application for a license to the operator;

3. The department has initiated revocation procedures and has determined that the lives, health, safety, or welfare of the residents cannot be adequately assured pending a full hearing on license revocation;

4. The facility is closing or intends to close and adequate arrangements for relocation of residents have not been made at least thirty days prior to closure;

5. An emergency exists in the facility;

6. The operator is insolvent; or

7. An owner of the land or structure is insolvent and such insolvency substantially affects the operation of the facility."

Mo. Rev. Stat. Ann. § 198.099.

18. Here, at least three (3) of the foregoing conditions exist: (A) Tenant is operating without a license; (B) Tenant is insolvent; and (C) an emergency exists at the facility.

### A. *Tenant is Operating Without a Business License*

19. On February 27, 2023, Landlord received a notice from the City of Winchester regarding Tenant's failure to maintain a valid business license with respect to its operations. This notice revealed that Tenant had not had a business license since the change in ownership, which occurred back in the Spring of 2021. This notice from the City of Winchester further clarified that:

- Winchester Business Licenses are due the first day of October each year. Licenses are considered delinquent after the first day of November.

- Several Administrative Directors have been notified of Tenant's violation of Municipal Code Section 605.020 in failing to maintain a business license.

- In order to comply with the requirements for a license, Tenant must pass a current inspection of code compliance by the City's building department, which has not been done.

- A current inspection is required by the West County EMS and Fire.

- The City is also in receipt of a Revocation Notice from the Missouri Department of Revenue, which issue will also need to be resolved before a current license can be issued.

20. While the Tenant has taken certain actions to attempt to remedy these issues, it still has not appropriately and finally resolved the outstanding issues that must be completed as a prerequisite to obtaining a valid, current license. Because Tenant is (and has been) operating without a license, Landlord is entitled to the appointment of a receiver for the Property under Mo. Rev. Stat. Ann. § 198.099(1).

### B. *Tenant is Insolvent*

21. Secondly, and perhaps most importantly, Tenant is in dire financial straits and is insolvent. Under Missouri law, "a debtor is insolvent if the sum of the debtor's debts is greater

than all of the debtor's assets at a fair valuation." Mo. Rev. Stat. Ann. § 428.014(1); see also Mo. Rev. Stat. Ann. § 515.505(11) (defining "insolvent" as "a financial status or condition such that the sum of the person's debts is greater than the value of such person's property, at fair valuation.").

22. Here, the Tenant's assets pale in comparison to its debts. The Tenant is merely an operator of the Property and does not own any of the real estate. Its only material assets are accounts receivable. The Tenant's debts include millions of dollars in credit facilities from its secured lender, as well as from Landlord, and substantially all of its assets are encumbered.

23. In addition, "a debtor who is generally not paying his debts as they become due is presumed to be insolvent." Mo. Rev. Stat. Ann. § 428.014(2). Over the course of the last year, the financial statements provided by Tenant have reflected that Tenant is unable to pay amounts owed under the Lease and is further unable to fund operating costs at the Property. Over the course of the last year, Tenant has operated the Property at a loss and has failed to timely make payments owed under the Lease. Tenant has not made a single payment of the Rents due under the Lease since October 2022. Landlord estimates that the reserve accounts on which Tenant has previously relied will be depleted by April 2023, resulting in risk that the Tenant will be unable to pay expenses necessary to provide care for the residents at the Property and to properly maintain and insure the Property.

24. As an example, attached hereto and incorporated herein as **Exhibit D** is an accounts payable vendor aging report that was provided by the Tenant, as of December 31, 2022 (the "**AP Aging Report**"). The AP Aging Report indicates that Tenant has at least $1,276,205.38 in total accounts payable, with $596,567.08 in accounts payable that are over 151 days old. This means that nearly 50% of Tenant's $1.3 million in accounts payable are over five (5) months past due.

In addition, attached hereto and incorporated herein as **Exhibit E** are numerous default judgments against the Tenant.

25. Furthermore, on November 15, 2022, a survey was conducted at the Property by the Section for Long-Term Care Regulation ("**SLCR**") of the Missouri Department of Health and Senior Services to determine if the facility was in compliance with the federal participation requirements for nursing homes participating in Medicare and Medicaid programs.[1] Tenant received an F-level tag[2] during the survey, it was determined that it was not in substantial compliance with the participating requirements, and it was issued an F835 tag relating to administration of the facility, a true and accurate copy of which is attached hereto and incorporated herein as **Exhibit F**. This was because Tenant failed to ensure payments were issued or issued in a timely manner to the facility's medical director, dietician, and other necessary vendors utilized to provide services for the needs of the residents. The Statement of Deficiencies specifically outlines the payment deficiencies, which include pharmacy services provided (1.5 years of non-payment), lab providers (9 months non-payment), dietician (1 year non-payment), mobile x-ray company (10 months non-payment), medical director (7 months non-payment), medical supply company (unpaid invoices from Oct 21-May 22), food service distributor (invoices on payment plan), wastewater company, gas utility company (no current payments made), electrical company (no current payments made), pest control company (no payment in 1.5 years and services suspended), and a fire protection company (not current and has to frequently suspend services to get payment).

---

[1] An inspection to determine compliance with the Missouri Omnibus Nursing Home Act was conducted concurrently with the survey.
[2] Under the CMS scope and severity grid, a tag at an F level would mean the issue was "widespread" and "No actual harm with potential for more than minimal harm that is not immediate jeopardy."

26. As a result of the survey, SLCR advised Tenant that payments for new Medicare and Medicaid admissions will be denied on February 15, 2023, and that as of that date, Tenant will be prohibited from submitting or receiving payment for services rendered to Medicare and Medicaid recipients who are admitted to the Property thereafter. SLCR also advised Tenant that if substantial compliance with all requirements for participating in the Medicare and Medicaid program is not achieved by May 15, 2023, the facility's Medicare and Medicaid participation will be terminated.

27. As another example of Tenant's insolvency, the Tenant's Chief Executive Officer recently confirmed in writing last week it did not have the funds to pay a bill in the amount of $4,500, and Tenant requested that Landlord pay this bill despite the fact that Tenant is obligated to pay it under the terms of the Lease for repairs. Undersigned counsel further confirmed that Tenant was unable to pay this $4,500 bill with counsel for Tenant. In addition, attached hereto and incorporated herein as **Exhibit G** is an invoice that Tenant is obligated to pay on April 1, 2023, in the amount of $424,843.61. Landlord cannot possibly fathom how Tenant will have the ability to timely pay this invoice when they cannot afford to pay an invoice for $4,500.

28. Clearly, the Tenant is not paying its debts as they become due, and as such, Tenant is presumed to be insolvent. In addition, the sum of the Tenant's debts is greater than the sum of all the Tenant's assets. Accordingly, because Tenant is insolvent, Landlord is entitled to the appointment of a receiver for the Property under Mo. Rev. Stat. Ann. § 198.099(6).

### C. *An Emergency Exists at the Facility*

29. Lastly, given the totality of the circumstances and the compounding issues at the Property, an emergency exists at the facility.

30. On January 25, 2023, another survey and revisit was conducted at the Property, which revisit was failed. As a result of this survey, Tenant was issued four new tags, including an F578 tag for advanced directives, an F584 tag for safe/clean homelike environment, an F677 tag for ADL care provided for dependent residents, and an F684 tag for quality of care. As a result of this survey, Tenant also received another failed F835 tag for administration from November 15, 2022. True and accurate copies of these tags are attached hereto and incorporated herein as **Exhibit H**. The Statement of Deficiencies contained in these new tags included Tenant's failure to ensure physician orders for code status were obtained and documented in the medical record for multiple residents, the Tenant's failure to provide hot water temperatures required in resident rooms and showers, the Tenant's failure to provide homelike environment with floors, walls, and doors remaining in good repair in resident areas, and the Tenant's failure to provide adequate perineal care, among a litany of other issues.

31. On February 15, 2023, another survey was conducted at the Property. This survey resulted in the issuance of two tags, an F686 tag[3] for treatment/services to prevent/heal pressure ulcers, and an F725 tag for insufficient nursing staff. True and accurate copies of these tags are attached hereto and incorporated herein as **Exhibit I**. The Statement of Deficiencies contained in these new tags included Tenant's failure to ensure a resident received care, consistent with professional standards of practice, to promote and treat pressure ulcers, and Tenant's failure to ensure sufficient numbers of staff to meet the needs of the residents.

32. On March 1, 2023, a life safety survey was conducted at the Property. This survey resulted in the issuance of four k-tags, a K111 tag for building rehabilitation, a K161 tag for building construction type and height/failure of property fire protection under code, a K321 tag for

---

[3] This F686 tag was cited at "G" level, which means that there was actual harm to a patient due to Tenant's deficiency.

hazardous areas that residents have access to, and a K363 tag for corridor doors. True and accurate copies of these tags are attached hereto and incorporated herein as **Exhibit J**. The Statement of Deficiencies contained in these new tags included Tenant's rehabilitation of the building without plans approved by the engineering unit at Public Health, the failure of proper fire protection due to ceiling openings, missing ceiling tiles, missing drywall, holes in walls, and missing doors, and hazardous areas caused by faulty or failing doors.

33. Additionally, attached hereto and incorporated herein as **Exhibit K** is an occupancy inspection report from March 2023, that includes a litany of items that must be repaired prior to Tenant being able to obtain an occupancy permit. This occupancy inspection report outlines numerous permits that Tenant needs to obtain for a myriad of required repairs, and it further evidences Tenant's abject failure to maintain the Property to a minimum level of safety where the city will not even issue an occupancy permit until these items are fixed.

34. It should be noted that three affiliated nursing homes being operated by Tenant (or an affiliate of Tenant under common ownership) have been placed in receivership in Ohio for similar reasons. These homes in receivership are: (i) the Echo Manor and Rehabilitation Center, located at 10270 Blacklick-Eastern Road NW, Pickerington, County of Fairfield, Ohio; (ii) Summit's Trace Nursing Home, located at 935 N. Cassady, Columbus, County of Franklin, Ohio; and (iii) the Advanced Rehab of Clifton Park, located at 510 Oak Street, Cincinnati, Ohio.

35. It is readily apparent and abundantly clear that an emergency exists at the Property, which is teetering on an irreparable state of disrepair. Tenant's mismanagement of the Property is jeopardizing the quality of care the residents are receiving and the conditions in which they are living. Accordingly, because of the emergency at the facility, Landlord is entitled to the appointment of a receiver for the Property under Mo. Rev. Stat. Ann. § 198.099(5).

## II. Authority Under the Missouri Commercial Receivership Act

36. As an alternative basis for relief, Landlord is entitled to the appointment of a receiver under the MCRA in order to immediately prevent any further dissipation or diminution of value of the Property.

37. As set forth above, Tenant is in breach with respect to its obligations owed under the Lease as a result of Tenant's failure to complete the required repairs at the Property, failure to make timely payments of amounts owed under the Lease, failure to maintain a proper license to conduct business at the Property, and overall failure to properly maintain the Property which has resulted in West County and the local health department providing notice to the Tenant that all operations at the Property must cease within thirty days from February 27, 2023 and all residents located therein must be relocated and receive relocation notices by March 2, 2023.

38. This Court is empowered to appoint a receiver pursuant to RSMo. §515.500 *et seq.*, known as the Missouri Commercial Receivership Act (the "**Receivership Act**") and Missouri Supreme Court Rule 68.02.

39. Under R.S.Mo. § 515.510, courts "shall have the power to appoint a receiver … to keep and preserve all property … entrusted to the receiver pending any legal or equitable action concerning the same … including in the following instances:

(2) in an action in which the person seeking appointment of a receiver has a lien on or interest in the property or its revenue-producing potential and either …

(a) The appointment of a receiver with respect to the property or its revenue-producing potential is necessary to keep and preserve the property or its revenue-producing potential or to protect any business or business interest concerning the property or its revenue-producing potential;

. . .

(9) In an action against any entity if that person is insolvent or is not generally paying the entity's debts as those debts become due unless they are the subject of bona fide dispute;

. . .

(14) To prevent irreparable injury to the person or persons requesting the appointment of a receiver with respect to the debtor's property."

40. Additionally, Missouri Supreme Court Rule 68.02 states that:

Whenever in a pending legal or equitable proceeding it appears to the court that a receiver is necessary to keep, preserve and protect any business, business interest or property, including money or other thing deposited in court or the subject of a tender, the court, or any judge thereof in vacation, may appoint a receiver whose duty it shall be to keep, preserve and protect, to the extent and in the manner that the court may direct, that which the receiver is ordered to take into the receiver's charge.

41. The appointment of a receiver is appropriate in this matter pursuant to R.S.Mo. §515.510(2) and (14) to prevent irreparable harm to Landlord and the Property. It is essential that the Property maintain its operations as an assisted living facility and provide continuous services to the current residents therein. If operations at the Property are terminated by local officials and relocation notices sent out, then all residents will start to find new facilities, will ultimately relocate and the ability to generate any income from the Property will terminate. As the owner of the Property, Lender has a vested interest in: (i) protecting the value of the Property, the income therefrom and the personal property, and to prevent all risk of loss, removal, or material injury thereto; (ii) ensuring that the Property is adequately insured; (iii) ensuring that taxes on the Property are being paid in a timely fashion so as to prevent the possibility of tax liens; (iv) ensuring that the Property is subject to proper maintenance and repair; (v) ensuring that income and profits generated by the Property are being properly used for the benefit of the Property and are not being

Electronically Filed - St Louis County - March 29, 2023 - 08:33 PM

improperly diverted or subject to waste, diversion or diminution; and (vi) reviewing the books and records maintained in connection with the Property.

42. Further, the appointment of a receiver is necessary under R.S.Mo. §515.510(9) because over the course of the last year, the financial statements provided by Tenant have reflected that Tenant is unable to pay amounts owed under the Lease and is further unable to fund operating costs at the Property. Over the course of the last year, Tenant has operated the Property at a loss and has failed to timely make payments owed under the Lease. Landlord estimates that the reserve accounts on which Tenant has previously relied will be depleted by April 2023 resulting in risk that the Tenant will be unable to pay expenses necessary to provide care for the residents at the Property and to properly maintain and insure the Property.

43. The Landlord has no adequate remedy at law (other than under RSMo. §§ 515.500 *et seq*. and Missouri Supreme Court Rule 68.02) and is in need of this Court's Order Appointing Receiver to protect its interests in the Property and to keep, preserve, and maintain the Property.

44. Without the appointment of a receiver to take control of, collect, manage, and, with Landlord's prior written consent, liquidate the Property, and to enforce all rights of the Landlord in the Property, the Landlord and others will suffer irreparable injury and loss.

45. The appointment of a receiver pursuant to the Receivership Act and Missouri Supreme Court Rule 68.02 is appropriate for the foregoing purposes, with the power to take all actions of a receiver as defined in the Receivership Act, and with the enumerated powers set forth below.

46. The Landlord reserves the right, pursuant to the Lease, to pursue any and all other remedies that may be available to the Landlord pursuant to the Lease or applicable law.

47. The Landlord seeks the appointment of Michael J. Flanagan as a general receiver (the "**Receiver**") pursuant to §§ 515.515 *et seq*. of the Receivership Act. Section 515.515 provides in relevant part as follows:

> A receiver shall be a general receiver if the receiver is appointed to take possession and control of all or substantially all of a debtor's property and provided the power to liquidate such property.

48. The proposed Receiver is suitable and capable, with extensive knowledge and expertise in the management of assisted and independent living facilities. Mr. Flanagan is also familiar with the licensing requirements with respect to operation of such facilities. The Affidavit of Mr. Flanagan in support of the appointment of the Receiver has been filed contemporaneously herewith and is incorporated herein by reference. Attached to such Affidavit are the qualifications of the Receiver and the proposed rates and fees to be charged by the Receiver in this case.

49. Mr. Flanagan meets the requirements for appointment as a receiver under § 515.525 of the Receivership Act.

50. Lastly, Landlord requests that the Receiver have the authority and power to retain a management firm to assist the Receiver in the administration of its duties subject to Landlord's written approval.

WHEREFORE, the Landlord respectfully requests that the Court enter an Order:

A. Appointing Michael J. Flanagan as general Receiver over the Property, including all income, revenues, and proceeds of the same;

B. Granting to such Receiver all rights, powers, and authority as more fully set forth in the proposed Order Appointing Receiver;

C. Authorizing and directing the Receiver to retain a management firm; and

D. Granting such other and further relief as the Court deems just and proper.

Electronically Filed - St Louis County - March 29, 2023 - 08:33 PM

Dated: March 29, 2023

POLSINELLI PC

By: */s/ Matthew S. Layfield*
    MATTHEW S. LAYFIELD (MO #57540)
    NICHOLAS A. GRIEBEL (MO #69104)
    100 S. 4th Street, Suite 1000
    St. Louis, MO 63102
    (314) 552-6834
    Fax No. (314) 231-1776
    mlayfield@polsinelli.com
    ngriebel@polsinelli.com

By: */s/ Amy E. Hatch*
    AMY E. HATCH (MO #53116)
    900 West 48th Place, Suite 900
    Kansas City, Missouri 64112
    (816) 753-1000
    Fax No. (816) 753-1536
    ahatch@polsinelli.com

    ATTORNEYS FOR PLAINTIFF

## **CERTIFICATE OF ORIGINAL SIGNATURE**

Pursuant to Missouri Supreme Court Rule 55.03, the undersigned hereby certifies that she signed the original document herein and shall maintain that document for a period of not less than the maximum allowable time to complete the appellate process regarding this matter.

    /s/ *Matthew S. Layfield*
    Matthew S. Layfield

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was transmitted by serving a copy of the same in the above-captioned case on March 29, 2023, and upon the following parties:

Harvey Tettlebaum, Esq.
Husch Blackwell
235 East High Street
P.O. Box 1251
Jefferson City, MO 65101
Harvey.tettlebaum@huschblackwell.com
Counsel for Defendant

Charles H. Billings, Esq.
225 S. Meramec, Suite 1200
St. Louis, MO 63105
chb@law-stl.com
Counsel for City of Winchester and West County Fire and EMS District:

CNH Finance Fund I, L.P.
c/o Registered Agent Cogency Global Inc.
9666 Olive Blvd., Suite 690
St. Louis, MO 63132

CNH Finance Fund I, L.P.
c/o CNH Finance, L.P.
330 Railroad Avenue, Suite 101
Greenwich, CT 06830
Kincaid, Frame & Associates Co., LPA
6151 Wilson Mills Road, Suite 310
Highland Heights, OH 44143

Capital Funding, LLC
1422 Clarkview Road
Baltimore, MD 21209

Seyfarth Shaw LLP
560 Mission Street, Suite 3100
San Francisco, CA 94105
CT Corporation System, Registered Agent
120 South Central Avenue
Clayton, MO 63105

Kurt J. Dolan, Esq.
Ronald A. Caimi, Esq.
Michael A. Kasperek, Esq.
Brian H. Langley, Esq.
Vogler & Associates, Inc.
11756 Borman Drive, Suite 200
St. Louis, MO 63146
voglaw@earthlink.net
Counsel for Skilled Medical Solutions, Inc

Missouri Department of Health & Senior Services Division of Regulation and Licensure
912 Wildwood Drive
Jefferson City, MO 65102
Attention: Brenda Rackers
Brenda.rackers@health.mo.gov

Missouri Attorney General Office
207 W. High Street
Jefferson City, MO 65102

/s/ *Matthew S. Layfield*
Matthew S. Layfield